**HAITIAN CENTERS COUNCIL, INC.; National Coalition for Haitian Refugees; Immigration Law Clinic of the Jerome N. Frank Legal Services Organization of New Haven, Connecticut; Dr. Frantz Guerrier, Pascal Henry, Lauriton Guneau, Medilieu Sorel St. Fleur, Dieu Renel, Milot Baptiste, Jean Doe, Roges Noel, on Behalf of them-**

selves and all others similarly situated; A. Iris Vilnor, on Behalf of herself and all others similarly situated; Mireille Berger, Yvrose Pierre, Mathieu Noel, on Behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

Gene McNARY, Commissioner, Immigration and Naturalization Service; William P. Barr, Attorney General; Immigration and Naturalization Service; James Baker, III, Secretary of State; Rear Admiral Robert Kramek, Admiral Kime, Commandants, United States Coast Guard; Commander, U.S. Naval Base, Guantanamo Bay, Defendants–Appellants.

Nos. 1789, 1790.
Dockets 92–6090, 92–6104.

United States Court of Appeals,
Second Circuit.

Argued May 13, 1992.

Decided June 10, 1992.

**1328**

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., New York City, Michael Jay Singer, John F. Daly, Malcolm L. Stewart, Attys., Appellate Staff Civil Div.,

Dept. of Justice, Washington, D.C., of counsel), for defendants-appellants.

Harold Hongju Koh, New Haven, Conn. (Drew S. Days, III, Paul W. Kahn, Anthony T. Kronman, Burke Marshall, Peter H. Schuck, Lowenstein Intern. Human Rights Clinic, Allard K. Lowenstein Intern. Human Rights Law Project, New Haven, Conn., Michael Ratner, Jules Lobel, Suzanne Shende, Center for Constitutional Rights, Joseph Tringali, Simpson Thacher & Bartlett, New York City, Robert Rubin, Ignatius Bau, San Francisco Lawyers' Committee for Urban Affairs, San Francisco, Cal., Lucas Guttentag, Immigration Law Project, American Civil Liberties Union, New York City, of counsel), for plaintiffs-appellees.

Lory D. Rosenberg, American Immigration Law Foundation, Washington, D.C., Harvey Kaplan, Maureen O'Sullivan, Kaplan, O'Sullivan & Friedman, Boston, Mass., for amici curiae American Immigration Lawyers Ass'n and American Immigration Law Foundation.

Kenneth Roth, Ellen L. Lutz, Americas Watch, Jeffrey L. Braun, Michael A. Pearce, Rosenman & Colin, New York City, for amicus curiae Americas Watch.

Gregory Craig, Steven Schneebaum, Reed Brody, Janelle M. Diller, Intern. Human Rights Law Group, Washington, D.C., Gerald L. Neuman, Philadelphia, Pa., for amicus curiae Intern. Human Rights Law Group.

William G. O'Neill, Lawyers Committee for Human Rights, New York City, for amicus curiae Lawyers Committee for Human Rights.

Harlon L. Dalton, Nat. Com'n on AIDS, Washington, D.C., for amicus curiae Members of the Nat. Com'n on AIDS.

David D. Cole, Georgetown University Law Center, Washington, D.C., Dennis Courtland Hayes, Everald Thompson, NAACP Special Contribution Fund, Baltimore, Md., for amicus curiae Nat. Ass'n for Advancement of Colored People.

Before CARDAMONE, PIERCE, and MAHONEY, Circuit Judges.

PIERCE, Circuit Judge:

The Immigration and Naturalization Service ("INS") and various United States governmental officials appeal from an order entered in the United States District Court for the Eastern District of New York, Sterling Johnson, Jr., *Judge*, granting a preliminary injunction, and from a subsequent clarifying order. For the reasons set forth below, we affirm, as modified.

BACKGROUND

*General Background*

In September 1981, then-President Ronald Reagan determined that "[t]he ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States." Proclamation No. 4,865, 46 Fed.Reg. 48,107 (1981), *reprinted in* 8 U.S.C.A. § 1182 note (West Supp.1992). President Reagan, by Executive Order No. 12,324 ("Executive Order"), authorized the Secretary of State "to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea." Exec. Order 12,324, 46 Fed.Reg. 48,109 (1981), *reprinted in* 8 U.S.C.A. § 1182 note (West Supp.1992).

On September 23, 1981, the United States entered into an agreement with Haiti for "the establishment of a cooperative program of interdiction and selective return to Haiti of certain Haitian migrants and vessels involved in illegal transport of persons coming from Haiti." Agreement Between the United States of America and Haiti, September 23, 1981, U.S.-Haiti, T.I.A.S. No. 10,241. Under this agreement, United States authorities are permitted to board a "Haitian flag vessel" to make inquiries to determine the registry, condition and destination of the vessel and the status of those on board the vessel. If the United States determines that a violation of its laws or the laws of Haiti has been committed, it may detain the vessel and those found on board. The United States is permitted to return the detained vessel and

persons to a Haitian port, or if circumstances permit, release such vessel and migrants on the high seas to representatives of the Haitian government. The agreement provided that the United States "does not intend to return to Haiti any Haitian migrants whom United States authorities determine to qualify for refugee status." In addition, the United States received assurances from Haiti that Haitians returned to their country would not be subject to prosecution for illegal departure.

In September 1981, the United States Coast Guard began interdicting vessels carrying Haitian aliens. Generally, under the interdiction program, INS officers interview interdicted Haitians to determine if there are any indications that a person might qualify as a "refugee." The purpose of this process, known as "pre-screening," is to determine whether the interdicted alien has a "credible fear of persecution." This process was designed to take place when the interdicted aliens are taken into custody on the Coast Guard cutters on the high seas. Those individuals found to have a credible fear of persecution if returned to Haiti are "screened in," and are eligible for transfer to the United States to pursue an asylum claim. Those individuals found not to have a credible fear are "screened out," and are repatriated to Haiti.

On September 30, 1991, the democratically elected government of Haiti was overthrown in a military coup, and its President, Jean–Bertrand Aristide, was forced into exile. Following the coup, reports surfaced of human rights violations by the military in Haiti. These alleged violations included killings, torture, arbitrary arrests without a warrant and the destruction of property. Allegedly, the Haitian military has targeted President Aristide's political supporters for threats, intimidation and persecution. Following the coup, the United States joined other nations in announcing the imposition of economic sanctions against Haiti.

Since the coup, thousands of people have fled from Haiti, mostly by boat. As a result of this substantial increase in migration from Haiti, the number of interdictions also increased. Following the coup, the United States temporarily suspended repatriations under the interdiction program. However, as of November 18, 1991, the United States resumed repatriations.

## The Baker Litigation

On November 19, 1991, the Haitian Refugee Center, Inc. ("HRC"), filed a complaint in the United States District Court for the Southern District of Florida challenging aspects of the interdiction program and seeking declaratory and injunctive relief (the "Florida Action"). See Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498, 1502–03 (11th Cir.) (per curiam), cert. denied, —— U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992). Named as defendants were: James Baker, III, Secretary of State; Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard; Gene McNary, Commissioner, Immigration and Naturalization Service; the United States Department of Justice; the Immigration and Naturalization Service; and the United States ("defendants in the Florida Action"). The Florida Action complaint asserted claims allegedly arising under the Executive Order, international law, the United Nations Protocol Relating to the Status of Refugees, United States immigration statutes and the fifth amendment. More specifically, HRC maintained that the INS had failed to comply with its own guidelines for the identification of refugees, promulgated pursuant to the Executive Order, and, thus, violated the rights of the interdicted Haitians. On that same day, the district court granted HRC's application for a temporary restraining order to maintain the status quo. This order precluded the defendants in the Florida Action from repatriating Haitians held on board United States vessels and held at the United States Naval Base, Guantánamo Bay, Cuba.

Following expedited discovery, HRC filed a second amended complaint and supplemental pleading adding claims on behalf of a putative class of Haitian plaintiffs. In addition to the claims asserted in the initial complaint, the second amended complaint alleged claims under the first amendment

and the Administrative Procedure Act, 5 U.S.C. §§ 551–706 (1988) ("APA"). More specifically, the second amended complaint alleged, *inter alia*, that the Florida Action defendants had denied the HRC access to the interdicted Haitians and argued that such denial was a violation of the first amendment. In addition, the second amended complaint claimed that the INS' interviewing process was in violation of the APA. In an order dated December 3, 1991, the district court determined that the second amended complaint could be maintained as a class action. On that same day, the court granted a motion for a preliminary injunction, finding that there was a substantial likelihood that the plaintiffs in the Florida Action would prevail on the merits of HRC's first amendment claim and the Haitian plaintiffs' claims under the Protocol. The district court concluded that the fifth amendment claims of the Florida Action plaintiffs "must fail." The defendants appealed.

On December 17, 1991, the Eleventh Circuit dissolved the preliminary injunction, finding it to be overly broad with regard to HRC's first amendment claim, and remanded with instructions to dismiss the Haitian plaintiffs' claims under the Protocol. *Haitian Refugee Center, Inc. v. Baker*, 949 F.2d 1109, 1111 (11th Cir.1991) (per curiam). Later that evening, the district court issued a temporary restraining order based upon a reconsideration of the claims of the plaintiffs in the Florida Action under the APA, whereupon, the Eleventh Circuit stayed that order pending appeal. *Haitian Refugee Center, Inc. v. Baker*, 950 F.2d 685, 687 (11th Cir.1991) (per curiam).

On December 20, 1991, the district court entered an order granting the plaintiffs in the Florida Action a limited preliminary injunction on HRC's first amendment claim. This order was supplemented by an order entered December 23, 1991 based upon the claims under the APA. These orders were stayed pending appeal.[1] On February 4, 1992, the Eleventh Circuit dismissed the appeal from the December 17

order as moot, and vacated the December 20 and December 23 orders. Further, the Eleventh Circuit remanded the case with instructions that the district court dismiss the complaint for failure to state a claim upon which relief could be granted. *See Baker*, 953 F.2d at 1515. On February 24, 1992, the Supreme Court denied the Florida Action plaintiffs' application for a stay of the mandates, and denied the Florida Action plaintiffs' petition for a writ of certiorari. *Haitian Refugee Center, Inc. v. Baker*, — U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992).

### The Present Litigation

On March 18, 1992, the plaintiffs herein filed a complaint in the United States District Court for the Eastern District of New York (the "New York Action"). Named as defendants are: Gene McNary, Commissioner, Immigration and Naturalization Service; William P. Barr, Attorney General; Immigration and Naturalization Service; James Baker, III, Secretary of State; Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard; and Commander, United States Naval Base, Guantánamo Bay.

The plaintiffs in the present litigation are: Haitian Centers Council, Inc.; the National Coalition for Haitian Refugees, Inc.; Immigration Law Clinic of the Jerome N. Frank Legal Services Organization of New Haven, Connecticut (collectively the "Haitian Service Organizations"); several "screened in" Haitians on behalf of themselves and others similarly situated (" 'screened in' plaintiffs"); several "screened out" Haitians on behalf of themselves and others similarly situated (" 'screened out' plaintiffs"); and several immediate relatives of Haitians detained at Guantánamo Bay on behalf of themselves and others similarly situated (" 'immediate relative' plaintiffs").

The complaint, *inter alia*, challenged the refusal by the defendants in the New York Action to allow the Haitian Service Organi-

---

1. The district court stayed the December 23 order. On January 31, 1992, the Supreme Court stayed the December 20 order.

zations to have access to the Haitian migrants on board Coast Guard cutters and at Guantánamo Bay for the purpose of providing them "legal counsel, advocacy, and representation" as a violation of the first amendment. In addition, in the New York Action, the complaint alleged that current governmental conduct under the interdiction program was in violation of United States immigration statutes, the fifth amendment, the APA, certain treaties and international agreements and executive directives.

On March 27, 1992, following oral argument, the district court in the New York Action granted the plaintiffs' motion for a temporary restraining order. The defendants argued that the rulings in the Florida Action precluded prosecution of the claims asserted by the New York Action plaintiffs; the district court responded that it agreed that the Florida Action rulings precluded assertion of the "screened out" plaintiffs' claims. With regard to the Haitian Service Organizations, the "screened in" plaintiffs, and the "immediate relative" plaintiffs, the court ruled that their claims were not barred by the Florida Action rulings.

On April 7, 1992, after conducting a hearing, the court granted the application of the plaintiffs in the New York Action and issued a preliminary injunction ("April 7 order"). The district court made, *inter alia,* findings of fact as set forth below.

The United States operates a naval base at Guantánamo Bay, Cuba. The area comprising the base is occupied pursuant to a lease between the United States and Cuba entered into in 1903, and amended by a 1934 treaty. The district court found that the United States base at Guantánamo Bay is a "relatively open base." Besides military personnel stationed there, there are "foreign nationals," civilian contractors of various nationalities and civilian United States employees present on the base.

The district court further found that, under the interdiction program, the Coast Guard has taken Haitian aliens interdicted on the high seas into custody and transported them to Guantánamo Bay. The Haitian aliens at Guantánamo Bay live in camps surrounded by razor wire fences. No Haitian alien is free to leave Guantánamo Bay to travel to any country other than Haiti, even at their own expense. They are not allowed access to telephones. Although the United States officials at Guantánamo Bay have provided the Haitian aliens with various services including educational programs, medical care and religious services, they have denied the aliens access to legal services. Congressmen, clergymen, church groups, and members of the press have been allowed access to the base and the Haitian aliens.

Further findings made were: under the interdiction program, INS officers at some point interview interdicted Haitians to determine whether they have a "credible" fear of political persecution if returned to Haiti. The district court found that those determined to have a credible fear are "screened in," and are to be brought to the United States so that they may pursue asylum claims. Those found not to have a credible fear are "screened out," and are to be repatriated to Haiti. Repatriated Haitians face political persecution and even death upon their return.

The district court also found that following the rulings of the Eleventh Circuit in the Florida Action, the government defendants therein, in a memorandum submitted to the Supreme Court in opposition to the plaintiffs' petition for certiorari, explicitly represented that "screened in" individuals would be brought to the United States so that they could file applications under the Immigration and Nationality Act ("INA") for asylum. Five days after the Supreme Court denied certiorari in the Florida Action, the defendants in the Florida Action changed this policy. On February 29, 1992, the General Counsel of the INS, Grover Joseph Rees, issued a memorandum regarding second interviews of "screened in" Haitians who have been determined to have a communicable disease and thus are subject to medical exclusion under the INA. The district court found that the government tests all Haitian aliens who have been "screened in" to determine whether they

have a communicable disease such as the HIV virus. According to the Rees memorandum, "screened in" Haitian aliens who have been found to have a communicable disease are to be given a second interview to determine if they have "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." The memorandum also states that this interview should "be identical in form, and substance or nearly so as possible, to those conducted by asylum officers to determine whether asylum should be granted to an applicant already in the United States." However, while asylum applicants in the United States may have attorneys present during their asylum interviews, the "screened in" Haitians subject to a second interview are not permitted access to an attorney during their second interview at Guantánamo Bay.

The district court found: when the INS officers began conducting second interviews, the Haitian aliens including the "screened in" plaintiffs herein began to seek the assistance of counsel. According to the deposition testimony of INS officers at Guantánamo Bay, the presence of attorneys during the second interviews could be useful, would be feasible and would not interfere with the interviewing process. Thirty four "screened in" Haitians who had tested positive for HIV and had failed to establish a "well-founded" fear of persecution during a second interview at Guantánamo Bay would have been repatriated absent the temporary restraining order. In addition, INS officials at Guantánamo Bay lost the records of a number of Haitian aliens and, consequently, some Haitian aliens had to be re-screened. After stating its findings of fact, the district court proceeded to draw conclusions of law. As an initial matter, it ruled that the claims of the "screened in" plaintiffs, the "immediate

relative" plaintiffs, and the Haitian Service Organizations were not precluded by the Florida Action. Addressing the legal standard for the issuance of a preliminary injunction, the court determined that the "screened in" plaintiffs and the plaintiffs comprising the Haitian Service Organizations had made a showing of irreparable harm by a preponderance of the evidence. It also concluded that there were serious questions going to the merits with regard to the Haitian Service Organizations' first amendment claim and the "screened in" plaintiffs' fifth amendment claim, but it found that the "screened in" plaintiffs could not state statutory claims under the INA. The court assessed the balance of hardships, and found that they tipped decidedly in favor of the plaintiffs. The court thus concluded that the standard for the issuance of a preliminary injunction had been satisfied, although it reserved judgment on several claims raised in the complaint. In addition, the court conditionally certified as a class the "screened in" plaintiffs.[2]

The district court in the New York Action granted the plaintiffs' application for a preliminary injunction on April 7, 1992. On April 8, 1992, the court denied the defendants' motion to stay the April 7 order. At that time, addressing a question as to whether serious questions going to the merits was the proper legal standard for the issuance of a preliminary injunction when the government was the responding party, the court stated that even if the appropriate standard were "likelihood of success on the merits," that standard also had been satisfied.

On April 14, 1992, this Court denied the defendants' motion for a stay of the April 7 order, but granted an application to expedite the appeal. On April 15, 1992, the district court issued an order to "clarify the

---

**2.** The district court stated: "Although the Screened In Plaintiff's motion for class certification is granted at this time, because the defendant challenges certain of plaintiff's factual allegations, I will permit them to conduct discovery and then this court will hold a hearing to ascertain whether the class certification herein granted should be modified."

Although the district court addressed the preclusive effect of the Florida Action as to the "screened out" plaintiffs and the "immediate relative" plaintiffs, it did not formally address the issue of class certification with regard to either group.

relief granted in the [April 7] Memorandum and Order." Under this order, the New York Action defendants were enjoined from:

(a) denying the Haitian Service Organizations immediate access, on Guantanamo, to any member of the class of Screened In Plaintiffs subject to reasonable time, place and manner limitations (regardless of whether any such Screened In Plaintiff has been furnished with an exact date and time for interview) for the purpose of providing them legal counsel, advocacy and representation;

(b) interviewing, screening, or subjecting to exclusion or asylum proceedings any Screened In Plaintiff who has been denied an opportunity to communicate with counsel; and

(c) repatriating any member of [the] class of Screened In Plaintiffs who was subjected to a second interview at which time s/he was screened out, until such time as such individual is afforded an opportunity to communicate with Haitian Service Organizations and given another interview thereafter.

Notwithstanding paragraphs (b) and (c) above, the Government may, at any time, transport members of the Screened In Plaintiff class to the mainland United States in accordance with the Government's representations to this court.

The defendants in the New York Action filed a notice of appeal from this order on April 18, 1992. The New York Action defendants also moved for a stay of the April 15 order as to paragraph (a). The district court denied the defendants' application. On April 17, 1992, this Court denied an application by the defendants for a stay. On April 22, 1992, the Supreme Court granted the defendants' application for a stay of the preliminary injunction under the April 7 order, as clarified by the April 15 order, pending disposition of the appeal by this Court.

## DISCUSSION

### Preclusive Effect of the Florida Action

■ On appeal, the defendants in the New York Action (hereinafter "appellants") claim, *inter alia*, that the district court erred in concluding that the "screened in" plaintiffs' fifth amendment claims were not barred by the Florida Action, and that the court erred in issuing its preliminary injunction.

The appellants argue that the Florida Action resolved the question of whether the fifth amendment confers procedural rights upon aliens abroad seeking to enter the United States. They contend that the "screened in" plaintiffs in the present case were members of the class certified in the Florida Action and thus their fifth amendment claims are barred by the doctrine of collateral estoppel. We briefly review some aspects of the Florida Action before addressing this contention.

In the complaint filed November 18, 1991, in the United States District Court for the Southern District of Florida, the Haitian Refugee Center, Inc. ("HRC") alleged that it sought to represent the interests of Haitians who had been intercepted by the United States Coast Guard. HRC sought declaratory relief that the Florida Action defendants' practices of "forcibly returning Haitian refugees to Haiti" violated, *inter alia*, the fifth amendment to the United States Constitution. HRC subsequently filed a second amended complaint, naming as additional plaintiffs fifteen individual Haitians asserted to have been "picked up at sea by the United States Coast Guard." According to the second amended complaint, fourteen of these individual Haitians had been "screened out." The second amended complaint alleged that these fourteen persons were subjected to an "interview [that] was inadequate to allow [them] to meaningfully assert [their] claim for asylum." [3]

The plaintiffs in the Florida Action moved pursuant to Fed.R.Civ.P. 23 to certify as a class:

---

**3.** It is unclear whether the fifteenth individual was "screened out" but the amended complaint alleged that his asylum interview lasted three minutes and that prior to his interview he was advised "that no matter what he said, he would be returning to Haiti."

all Haitian aliens who are currently detained or who will in the future be detained on U.S. Coast Guard cutters or at Guantanamo Naval base who were interdicted on the high seas pursuant to the United States Interdiction Program and who are being denied First Amendment and procedural rights.

In a memorandum of law submitted to the district court in support of their request for class action certification, the plaintiffs in the Florida Action asserted that the fifteen new plaintiffs "are all presently members of the class and in every respect fairly and adequately represent the interests of the class." The memorandum of law noted that the fifteen individual Haitians "have all been 'screened out' and thus are injured by the failure of the INS to observe rules and procedures designed to ensure that no person who is a political refugee will be returned without his consent." The memorandum asserted also that "[a]ll 15 plaintiffs were subjected to the failure of the defendants to comply with INS guidelines for screening asylum claims." The plaintiffs in the Florida Action asserted that the lawsuit fulfilled the requirements for certification as a class action under Fed. R.Civ.P. 23(a) and 23(b)(2).

In an order dated December 3, 1991, the district court in the Florida Action determined without reference to a specific provision of Fed.R.Civ.P. 23, that the second amended complaint could be maintained as a class action. In another order issued that same day, the district court ruled that to the extent that the Florida Action plaintiffs alleged that the interdiction and repatriation activities of the Florida Action defendants violated the fifth amendment of the Constitution, those claims "must fail." [4]

Thereafter the Eleventh Circuit, *inter alia,* vacated the injunctive orders of the district court issued December 20 and December 23 and remanded with instructions to dismiss the complaint, whereupon the plaintiffs in the Florida Action petitioned the United States Supreme Court for a writ of certiorari. The defendants, in the Florida Action, in a brief submitted to the Supreme Court in opposition to the Florida Action plaintiffs' petition for a writ of certiorari stated:

> Under current practices, any aliens who satisfy the threshold standard are to be brought to the United States so that they can file an application for asylum under Section 208(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1158(a). These "screened in" individuals then have the opportunity for a full adjudicatory determination of whether they satisfy the statutory standard of being a "refugee" and otherwise qualify for the discretionary relief of asylum. Any aliens who are initially "screened in" but ultimately not granted asylum are then to be returned to their country of origin, consistent with procedures afforded under the INA.

The petition for certiorari was denied by the Supreme Court on February 24, 1992. *Baker,* 112 S.Ct. at 1245. Five days later, INS General Counsel Grover Joseph Rees issued a memorandum regarding the processing of "screened in" Haitians on Guantánamo Bay who were excludable for admission to the United States by virtue of having a communicable disease of public health significance.[5] The memorandum directed that the "screened in" Haitians be re-interviewed to determine "whether he or she is a refugee within the definition of INA § 101(a)(42)" and thus might warrant

---

**4.** This portion of the district court's order was not appealed. *See Baker,* 953 F.2d at 1503–04.

**5.** Section 1182(a)(1)(A)(i) of 8 U.S.C. provides that aliens who have a communicable disease of public health significance (in accordance with regulations prescribed by the Secretary of Health and Human Services) are excludable. The Attorney General may waive the application of this section to any alien who is the spouse,

unmarried son or daughter, or minor lawfully adopted child of a United States citizen, or of a lawfully admitted alien, or to an alien issued an immigrant visa. 8 U.S.C. § 1182(g)(1)(A). The Attorney General may waive the application of § 1182(a)(1)(A)(i) to any alien who has a son or daughter who is a United States citizen, or to an alien who has been issued an immigrant visa. 8 U.S.C. § 1182(g)(1)(B).

parole into the United States for asylum processing.[6]

On March 18, 1992, the present suit was commenced in the Eastern District of New York. The complaint alleged, *inter alia*, that the first amendment rights of the Haitian Service Organizations—which does not include the Haitian Refugee Center, Inc., which was a party in the Florida Action— were being violated. The complaint also alleged that the New York Action defendants had violated the plaintiffs' rights to obtain counsel or to communicate with retained counsel in pursuing their claims for political asylum in contravention of the first and fifth amendments, and that the New York Action defendants had denied the detained Haitians equal protection of the laws "by creating and operating an unauthorized separate and unequal, asylum track for Haitians only." The complaint sought, *inter alia*, an order requiring the defendants "to transport all 'screened in' plaintiffs expeditiously to the United States so that they may be accorded asylum hearings with the full panoply of statutory rights." The complaint also sought a declaratory judgment that the New York Action defendants' alleged practices violated, *inter alia*, the first and fifth amendments to the United States Constitution. The New York Action plaintiffs moved for class certification, with respect to the following classes of plaintiffs: "[a]ll Haitian refugees who previously [were] 'screened in' and [were] detained on Guantanamo"; "[a]ll Haitian refugees who [had] retained plaintiff Haitian Service Organizations as counsel, who [might] retain plaintiff organizations as counsel in the future, or who [had] the right to obtain assistance of counsel from other persons"; "[a]ll Haitian refugees who [were] awaiting screening or who [had] been 'screened out' and currently [were] awaiting forcible repatriation, while being detained within territory subject to U.S. jurisdiction"; and all lawful permanent residents and citizens living in the United States who were also immediate close relatives of members of any of the above classes who had not been permitted to associate with their relatives because of actions of the New York Action defendants.

In the April 7 order, the district court conditionally certified as a class the "screened in" plaintiffs under Fed.R.Civ.P. 23(b)(2) and rejected the defendants' contention that the doctrine of *res judicata* bound the "screened in" plaintiffs from litigating this suit. The district court observed that in the Florida Action the motion for class certification was granted without a hearing and without amending the class definition and that the subject Haitians received neither notice nor an opportunity to opt-out. The district court noted that according to the Florida Action plaintiffs' description of the class in their memorandum of law in support of the motion for class certification, the class of Haitian plaintiffs in the Florida Action were "screened out" Haitians. The court found that the "screened in" plaintiffs, the "immediate relative" plaintiffs and the Haitian Service Organizations were new parties and not bound by the outcome of the Florida Action. The court did find, however, that the "screened out" plaintiffs in the New York Action were not a new class and that, consequently, these plaintiffs were bound by the outcome of the Florida Action and that their claims were barred under *res judicata*.

The district court in the New York Action also determined that *res judicata* was inapplicable because the conduct about which the new parties complained had not arisen at the time of the Florida Action. More specifically, the district court concluded that the "INS policy of conducting second interviews to determine whether Haitians carrying the HIV virus have a well founded fear of persecution was developed after the [Florida Action] ended" and that "only recently have the Haitian aliens sought the assistance of counsel." The

---

**6.** The appellees assert that this second interview will gather information that will inform the Attorney General's discretionary decision under 8 U.S.C. § 1157(c)(3) on whether to waive the medical exclusion to an otherwise excludable alien for humanitarian concerns. In order to be eligible for waiver of the medical exclusion the alien must be a "refugee." *See* 8 U.S.C. § 1157(a)(3).

district court found that the "screened in" plaintiffs' statutory right to counsel, first amendment and fifth amendment due process and equal protection claims were new, that the Haitian Service Organizations' first amendment claim was new and that as a new class all the "immediate relative" plaintiffs' claims were new.

On appeal, the appellants argue that the "screened in" plaintiffs herein were members of the class that was certified in the Florida Action and that their fifth amendment claims are barred by the doctrine of collateral estoppel. We disagree.

"[U]nder elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation. Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply.... A judgment in favor of either [the plaintiff class or the defendant] is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 874, 104 S.Ct. 2794, 2798, 81 L.Ed.2d 718 (1984) (citations omitted).

For the reasons discussed hereinbelow, we conclude that the class defined in the Florida Action was overly broad, that the issues presented in the present suit were not actually litigated or determined in the Florida Action and thus we decline to apply the doctrine of collateral estoppel to the "screened in" plaintiffs' fifth amendment claims.

It cannot be said that the "screened in" plaintiffs' fifth amendment claims were fairly and adequately represented within the meaning of Fed.R.Civ.P. 23(a)(4) in the Florida Action. The Florida Action plaintiffs alleged that the Florida Action defendants' practices of forcibly returning interdicted persons to Haiti violated the fifth amendment to the United States Constitution in that the defendants in the Florida Action did not comply with the guidelines promulgated by the INS pursuant to the Executive Order. In moving for class cer-

tification, the plaintiffs in the Florida Action presented fourteen "screened out" persons as representative members of the class. However, when the class was certified in the Florida Action, it was the INS' announced policy to bring "screened in" Haitians to the United States so that they could file an application for asylum. In fact, since the interviews conducted by United States officials already had determined that numbers of Haitians had a "credible" fear of persecution, resulting in their being ·"screened in," it is not at all likely that the "screened in" Haitians would have alleged that the "interview [they were] afforded ... was inadequate to allow [them] to meaningfully assert [their] claim for asylum," as the "screened out" Haitians had alleged in the second amended complaint. Despite the broadly defined class and potentially conflicting interests of the members in the purported class in the Florida Action, the class definition was not modified by the district court prior to granting class certification, although "the presence of antagonistic interests within [a Rule 23(b)(2)] class can be handled by redefining the class or creating subclasses under Rule 23(c)(4)." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure:* Civil § 1775 at 457 (2d ed. 1986).

■ We are aware that Rules 23(b)(2) and 23(d)(2) do not require notice to allow a class member an opportunity to opt-out of a class action suit. *See Penson v. Terminal Transport Co., Inc.,* 634 F.2d 989, 993–94 (5th Cir. Unit B 1981). Nonetheless, in this case we note that

> an over-broad framing of the class may be so unfair to the absent members as to approach, if not amount to, deprivation of due process.... [¶] Some of the difficulty may be sifted out by findings of the trial court at or during the trial that the plaintiff adequately represents the class. But this issue itself may be determined in the absence of 99.9% of those affected, who have had no notice or service of process or right to be heard and who may feel that the plaintiff in the particu-

lar case (or his counsel, or both) is the last-person they want representing them. *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1126–27 (5th Cir.1969) (Godbold, J., specially concurring) (footnote omitted). When there is a "strong community of interests" between plaintiffs in a prior suit and plaintiffs in a subsequent suit in that same court

> [t]he proper balance between the public policy of requiring a finality to judgments which settle issues in litigation and that of preventing [violation of the legal rights of a subsequent class of plaintiffs who file suit] after such a judgment has been rendered may be achieved by applying the rule of "issue preclusion."

*Bronson v. Board of Ed. of the City Sch. Dist. of Cincinnati*, 525 F.2d 344, 349 (6th Cir.1975) (citations omitted), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976). However, in this case the "community of interests" between the "screened in" plaintiffs in the New York Action and the plaintiffs in the Florida Action is not sufficiently strong to warrant preclusion. The plaintiffs in the Florida Action sought to enjoin the return of interdicted "screened out" Haitians to Haiti, whereas in this suit the plaintiffs in the New York Action apparently seek to enjoin the defendants from repatriating "screened in" Haitians without transporting them "to the United States so that they may be accorded asylum hearings with the full panoply of statutory rights." As previously noted, it is not likely that the "screened in" Haitians, who had been determined to have a "credible" fear of persecution, would have challenged the interview they were afforded in the same manner that the "screened out" Haitians had in the second amended complaint in the Florida Action. Moreover, the New York Action plaintiffs challenge conduct that was "not in existence at the time of the judgment in [the Florida Action] and could not have been extinguished by it." *Id.* The district court found, and we agree, that the second interview procedures outlined in the February 29, 1992 Rees memorandum constitutes a material change in the INS' policy toward "screened in" Haitians from the INS' previous policy of bringing "screened in" aliens to the United States for asylum proceedings. We conclude that the doctrine of collateral estoppel does not apply to the "screened in" plaintiffs' fifth amendment claims.

*Preliminary Injunction*

■ Our standard of review for the issuance of a preliminary injunction is whether such issuance constitutes an abuse of discretion. Applying legal standards incorrectly or relying upon clearly erroneous findings of fact may constitute an abuse of discretion. *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991).

"The standard for issuing a preliminary injunction is well-settled in this Circuit.... The party seeking the injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Id.; see Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ In the April 7 order, the district court found that the New York Action plaintiffs had demonstrated the threat of irreparable harm should the injunction not be granted and sufficiently serious questions as to the merits of their claims under the first and fifth amendment, and that the balance of the hardships tipped decidedly in their favor. In response to a motion by the New York Action defendants, the district court, on April 8, 1992, noted that it had applied the proper standard in granting the preliminary injunction. Nevertheless, the district court also found that the "likelihood of success on the merits" standard was met as well. On appeal, the appellants argue that the "serious questions" prong of the preliminary injunction standard is not available when the movant seeks to enjoin "actions taken by government officials in the fulfillment of their public duties." Based upon this assertion, the appellants claim that the district court ap-

plied the incorrect standard in its April 7 order. We disagree.

The appellants rely primarily upon *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535 (2d Cir.1977) and *Union Carbide Agric. Prod. Co., Inc. v. Costle*, 632 F.2d 1014 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). We believe both *Medical Soc'y* and *Union Carbide* are distinguishable from the present case. In both *Medical Soc'y* and *Union Carbide*, private litigants sought to enjoin a government agency from taking action in the public interest authorized by a specific statute. *See Medical Soc'y*, 560 F.2d at 537 (recipients of Medicaid and physicians sought to enjoin state agencies from implementation and enforcement of New York Soc. Serv. Law § 365–a(5)(a), (b), (c) and (e) (McKinney Supp.1976–77)); *Union Carbide*, 632 F.2d at 1016 (producers of pesticide chemicals sought to enjoin enforcement of certain provisions of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136a(c)(1)(D) and 136h(d) (Supp. II 1978)); *see also Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989) (citing *Medical Soc'y* and *Union Carbide* and stating district court should not apply less rigorous standard where "moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme").

The appellants assert that their conduct at issue at Guantánamo Bay "is plainly taken pursuant to Congress' broad grant of authority in the INA." By this argument, the appellants apparently "assume[ ] that the public interest [rests] solely with it." *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980). We believe that in litigation such as is presented herein, no party has an exclusive claim on the public interest. *See Almonte v. Pierce*, 666 F.Supp. 517, 526 (S.D.N.Y.1987). We thus believe that *Medical Soc'y* and *Union Carbide* are not applicable herein. Further, the "likelihood of success" prong need not always be fol-

lowed merely because a movant seeks to enjoin government action. *See Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir.1984) (Friendly, J., dissenting); *see also, e.g., Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 836 F.2d 760, 763 (2d Cir.1988) (per·curiam); *Patton v. Dole*, 806 F.2d 24, 28–30 (2d Cir.1986); *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141–42 (2d Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987).

### 1. Irreparable Harm

■ In the April 7 order, the district court concluded, *inter alia*, that the "screened in" plaintiffs had established by a preponderance of the evidence that irreparable harm would result should the preliminary injunction not be granted. The court found that the "screened in" plaintiffs "may face torture [and] death if they lack access·to counsel, fail in their bids to receive asylum, and are repatriated to Haiti."[7] As this conclusion was based upon the district court's findings of ·fact, and is supported by the record, we do not believe that the district court erred in its findings of irreparable harm. *Cf. Nunez v. Boldin*, 537 F.Supp. 578, 587 (S.D.Tex.) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."), *dismissed without opinion*, 692 F.2d 755 (5th Cir.1982).

### 2. Serious Questions Going to the Merits

■ One of the crucial issues presented herein is whether aliens interdicted on the high seas by the United States Coast Guard, who have been found by the government's representatives to have a "credible" fear of persecution on account of "membership in a particular social group[ ] or political opinion," and are then forcibly detained by United States governmental authorities on property that is under the exclusive control of the United .

---

7. In its opinion and order granting a temporary injunction, the district court stated "[a]ccording to the plaintiffs, aliens are three times more likely to receive asylum in an exclusion or de-portation hearing, and twice as likely to success [sic] in an affirmative asylum claim when represented by counsel."

States government, may avail themselves of the due process clause of the fifth amendment. The unique facts of this case—namely, the interdiction of plaintiffs by United States officials, the status of the territory upon which they are detained, and the "credible" asylum claim they have already been found to possess—lead us to believe that the district court properly issued a preliminary injunction upon finding that there were serious questions going to the merits of the "screened in" plaintiffs' fifth amendment claims.

The district court found that there were serious questions going to the merits of the Haitian Service Organizations' first amendment claim and as part of the preliminary injunction ordered the defendants to permit the Haitian Service Organizations to have immediate access to the "screened in" Haitians on Guantánamo Bay subject to reasonable time, place and manner restrictions. At this point in these proceedings, we need not and do not address the first amendment claim of the Haitian Service Organizations. However, as discussed below, we vacate that portion of the injunction ordering the defendants to allow the Haitian Service Organizations immediate access to the "screened in" Haitians on Guantánamo Bay, although we agree with the remainder of the district court's order.

▇▇▇ Judicial review of immigration and naturalization matters is limited. Article I, section 8, clause 4 of the United States Constitution grants Congress the power to "establish an uniform Rule of Naturalization," and the Executive Branch of the federal government has inherent sovereign power to regulate in the immigration field. *See United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). The Supreme Court has stated that " 'the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial review.' " *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S.

206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)) (citations omitted).

Pursuant to its constitutional authorization, Congress has enacted the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1557 (1988). The INA delegates decisions regarding the naturalization of persons to the discretion of authorities in the Executive Branch.

We first look to whether "aliens," which the INA defines as "any person not a citizen or national of the United States," 8 U.S.C. § 1101(a)(3), have any rights under the INA. The Supreme Court has stated that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application," *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982), and that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff,* 338 U.S. at 544, 70 S.Ct. at 313.

The applicability of the INA is expressly limited to "an alien physically present in the United States or at a land border or port of entry." *See* 8 U.S.C. § 1158(a). The Haitians in this case were interdicted on the high seas and are being held at Guantánamo Bay, Cuba. They are neither physically present in the United States, as defined in the INA, *see* 8 U.S.C. § 1101(a)(38), nor at a port of entry of the United States, *see* 8 U.S.C. § 1225; 8 C.F.R. §§ 100.4(c), 235.1(a). Therefore, the district court correctly determined that Congress and the Executive Branch have not authorized a procedure under the INA and the regulations promulgated thereunder that applies to the subject interdicted and "screened in" Haitians detained on Guantánamo Bay.

Notwithstanding the limited scope of judicial review in immigration and naturalization matters, the Supreme Court has indicated that a court may review the procedures employed by the government in an immigration setting to assure that the procedures appropriate under the circumstances comport with constitutional due process, *Landon,* 459 U.S. at 34–35, 103

S.Ct. at 330–331, and the federal judiciary is not precluded from considering whether immigration policies and procedures violate constitutional rights and protections. *Cf. Jean v. Nelson,* 472 U.S. 846, 853–57, 105 S.Ct. 2992, 2996–98, 86 L.Ed.2d 664 (1985).

With the foregoing in mind, we now address the appellees' fifth amendment arguments. The appellees do not contend that the "screened in" plaintiffs have a right to enter the United States. Rather, they claim that the "screened in" plaintiffs have a right, arising under the due process clause of the fifth amendment, not to be deprived of their "liberty" without due process of law. This "liberty" interest, they assert, includes the "freedom not to be sent back to conditions of persecution or death without a fair adjudication that they are not *bona fide* asylees." The appellees claim that such a deprivation of liberty exists independently of any claim to enter the United States.

Noting that the due process clause applies to excludable aliens held at INS detention centers in the United States, the appellees assert that the unique status of the "screened in" plaintiffs warrants even greater due process protections than those afforded excludable aliens in the United States. They argue that, unlike most aliens detained at INS detention facilities, INS officials already have found that the "screened in" plaintiffs have a "credible" fear of political persecution if returned to Haiti.[8] As further indications of their unique situation, appellees allege that Guantánamo Bay is unlike virtually all other United States military establishments on foreign soil because it is subject to the exclusive jurisdiction and control of the United States, and point out that United States laws apply there. We further note that the district court found that "[n]o detainee in custody is free to go to any country other than Haiti even at their own expense."

The appellees claim that as "de facto asylees" the "screened in" plaintiffs have liberty and property interests in not being returned to Haiti without a fair and adequate adjudication of their asylum applications. They also claim that the detention of the "screened in" plaintiffs, without access to counsel, effectively leaves them exposed to and unable to challenge any illegal attempts to return them to Haiti, notwithstanding United States commitments made in its 1981 agreement with the then-existing government of Haiti.[9]

In reply, the appellants claim that extensive United States control over Guantánamo Bay, does not entitle the interdicted Haitians to greater constitutional protections than those afforded aliens who have actually entered the United States. They contend that determinations with respect to refugee status are routinely made at locations abroad, for example, visa applicants at an embassy have no procedural rights regarding their applications.[10] The appellants argue that since the detained Haitians have not "entered" the United States within the meaning of 8 U.S.C. § 1158(a), they are not entitled to any protections under the due process clause. When inquiry was made at oral argument before this Court, the appellants stated that the "screened in" plaintiffs had no right to attorneys even if they had been subjected to physical abuse on Guantánamo Bay, although appellants speculated that in order to address such

---

**8.** At oral argument before this Court, the appellees pointed out that if the asylum proceedings were conducted in the United States (as the government had done during the previous decade of the Haitian interdiction program and promised to do when the Haitians herein were initially detained), the "screened in" plaintiffs could receive the assistance of counsel and would enjoy a statutory right to appeal an adverse ruling on their asylum application.

**9.** Appellees further maintain that it cannot be gainsaid that as excludable aliens "screened in" plaintiffs have a fundamental right to challenge

their conditions of confinement. They assert that as detained persons who are "being held incommunicado, without the right to leave Guantanamo, and without recourse if subjected to misconduct or arbitrary action," access to counsel is essential to address any possible violations of the "screened in" plaintiffs' due process rights to assure humane and adequate conditions of confinement.

**10.** *See, e.g., Wan Shih Hsieh v. Kiley,* 569 F.2d 1179, 1181 (2d Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978).

conduct the "screened in" plaintiffs possibly had rights and remedies under international law and under local rules and regulations established by the authorities at Guantánamo Bay.

Our review of the unique facts and circumstances of this case leads us to conclude that, in addition to a proper finding of irreparable harm, the district court correctly found that there are serious questions going to the merits of the "screened in" plaintiffs' fifth amendment due process claims and that the balance of the hardships tips decidedly in the "screened in" plaintiffs' favor to warrant the issuance of the injunction, as modified below.

In 1903, the United States and Cuba entered into an "Agreement for the Lease of the United States of Lands in Cuba for Coaling and Naval Stations." Under this lease agreement, the United States was permitted to lease Guantánamo Bay for "coaling or naval stations only, and for no other purpose." The lease agreement provides:

> While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement *the United States shall exercise complete jurisdiction and control over and within said areas* with the right to acquire (under conditions to be hereafter agreed upon by the two Governments) for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

Agreement for the Lease of the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 23, 1903, U.S.–Cuba, art. III, T.S. No. 418 (emphasis added).[11]

Interestingly, both United States citizens and aliens alike, charged with the commission of crimes on Guantánamo Bay, are prosecuted under United States laws. *See United States v. Lee*, 906 F.2d 117, 117 & n. 1 (4th Cir.1990) (per curiam) (appeal from dismissal of indictment of Jamaican national who had been charged with sexual abuse that allegedly occurred on Guantánamo Bay); *United States v. Rogers*, 388 F.Supp. 298, 301 (E.D.Va.1975) (conviction of civilian employee of company doing work on Guantánamo Bay); *see also* 18 U.S.C. § 7 (defining "special maritime and territorial jurisdiction of the United States" for purposes of United States crimes). During the preliminary injunction hearing before the district court herein, a former commander of the Joint Task Force at Guantánamo Bay Naval Base was called by the appellants and testified concerning two incidents with respect to interdicted Haitians detained on Guantánamo Bay that were consistent with the practice of applying United States criminal law on Guantánamo Bay. The former commander testified that an American sailor was prosecuted and court-martialed for raping a female Haitian alien on the base and, further, that the rape of a female Haitian alien on the base by a male Haitian alien was investigated by the United States Attorney's Office in Norfolk, Virginia.[12]

As the district court noted, the language of the fifth and fourteenth amendments does not suggest that they apply only to areas fitting a circumscribed definition of the United States. Guantánamo Bay is a military installation that is subject to the *exclusive* control and jurisdiction of the United States. The Supreme Court has recently reaffirmed that fundamental constitutional rights are guaranteed to inhab-

---

**11.** The lease agreement was modified and continued in effect by a 1934 treaty between the countries. Treaty between the United States of America and Cuba Defining their Relations, May 29, 1934, art. III, T.S. No. 866. The treaty modification did not change the pertinent provisions of the lease agreement.

**12.** We note that although the American sailor was court-martialed apparently in accordance with the Uniform Code of Military Justice, 10 U.S.C. §§ 801–935, a federal law to which he voluntarily submitted upon joining the armed forces, there is no indication that the male Haitian similarly voluntarily submitted to be prosecuted under United States law.

itants of territory where the United States has sovereign power. *See United States v. Verdugo–Urquidez*, 494 U.S. 259, 268, 110 S.Ct. 1056, 1062, 108 L.Ed.2d 222 (1990) ("Only 'fundamental' constitutional rights are guaranteed to inhabitants of [unincorporated] territories [not clearly destined for statehood]."). In its later discussion of *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), which involved convicted, enemy aliens in occupied territories outside the United States, the Court stated that it "had rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Verdugo–Urquidez*, 494 U.S. at 269, 110 S.Ct. at 1063. We believe the question remains unanswered and raises serious questions going to the merits of appellees' claim that the fifth amendment applies to non-accused, non-hostile aliens held incommunicado on a military base within the *exclusive* control of the United States, namely Guantánamo Bay. It also raises questions such as whether the treatment of civilians and aliens alike, by the authorities on that military base implies that these persons enjoy due process in terms of civil and criminal laws applied there, and, if so, suggests that the "screened in" plaintiffs also must be accorded due process of law, including access to attorneys—who in this case appear ready, willing and able to counsel and assist the Haitian plaintiffs at no expense to the government for their services. Justice Kennedy observed in his concurrence in *Verdugo–Urquidez*, "the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Id.* at 275, 110 S.Ct. at 1066 (Kennedy, J., concurring). However, the interdicted Haitians are not "some undefined, limitless class of noncitizens who are beyond our territory," they are instead an identifiable group of people who were interdicted by Americans in international waters pursuant to the binding Agreement Between the United States of America and Haiti, and who have been detained on territory that is subject to the exclusive control of the United States. In short, in this case the United States has exercised its "undoubted power … to take actions to assert its legitimate power and authority abroad," *id.* at 277, 110 S.Ct. at 1067, in both interdicting and bringing these Haitians to territory controlled by the United States. It does not appear to us to be incongruous or overreaching to conclude that the United States Constitution limits the conduct of United States personnel with respect to officially authorized interactions with aliens brought to and detained by such personnel on a land mass exclusively controlled by the United States. *See United States v. Tiede*, 86 F.R.D. 227 (U.S.Ct. Berlin 1979). We note that, in the present case, applying the fifth amendment would not appear to be either "impracticable" or "anomalous" since the United States has exclusive control over Guantánamo Bay, and given the undisputed applicability of federal criminal laws to incidents that occur there and the apparent familiarity of the governmental personnel at the base with the guarantees of due process, fundamental fairness and humane treatment that this country purports to afford to all persons. *See Verdugo–Urquidez*, 494 U.S. at 278, 110 S.Ct. at 1067 (Kennedy, J., concurring).

It appears from our brief references discussed above that arrested and accused aliens at Guantánamo Bay, Cuba, are subject to United States criminal laws—and it may be shown upon a fuller record that United States civil laws apply to the conduct of all aliens on the base as well—thus, by implication, the due process clause of the fifth amendment applies to them. We believe there is no principled basis for concluding that the "screened in" plaintiffs detained at the base would have fewer substantive rights than these other aliens.

Courts have determined that the due process clause applies to both the statutory asylum procedure employed by the INS, *see Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984), and the treatment of excludable aliens detained within the United States. *See Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir.1987); *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th

Cir.1981). Although the INA does not extend to Guantánamo Bay, there is a serious question whether the reach of the Constitution does, and we believe there exist serious questions going to the merits of the appellees' claim that since Guantánamo Bay is under the "complete jurisdiction and control" of the United States, the "screened in" plaintiffs may avail themselves of the protections of the due process clause of the fifth amendment to ensure that United States officials afford them due process.

Finally, we look to the significance of the detained Haitians having been "screened in." An alien is "screened in" after being found to have a credible fear of returning to his country of origin. According to a November 22, 1991 INS memorandum, a credible fear of returning to the country of origin is defined "as an apprehension or awareness, which appears to be truthful ... of serious danger or threat of harm on account of race, religion, nationality, membership in a particular social group, or political opinion." The government states in its reply brief that "the decision to screen in a particular migrant is of course an important step in that migrant's effort to obtain entry into the United States...."

The appellees argue that once they are "screened in," i.e., are found to possess a credible fear of returning to their country of origin, the Haitians have a reasonable expectation of not being returned forcibly to a country where they will suffer political persecution without having had a fair adjudication of their asylum applications. Appellees assert that this interest is grounded upon, *inter alia,* the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6,223, T.I.A.S. No. 6,577,[13] the Refugee Act of 1980, the Executive Order and the INS' own memoranda.

The United States is a party to the United Nations Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), 19 U.S.T. 6,223, T.I.A.S. No. 2,545, and binds the signatories to the Articles of the 1951 Convention. *See INS v. Stevic,* 467 U.S. 407, 416, 104 S.Ct. 2489, 2494, 81 L.Ed.2d 321 (1984). Article 33.1 of the 1951 Convention provides:

No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

The Refugee Act of 1980 conformed this nation's domestic laws with its treaty obligations under the United Nations Protocol Relating to the Status of Refugees. *Chun v. Sava,* 708 F.2d 869, 870 n. 2 (2d Cir. 1983). The Executive Order provides, in part, that "no person who is a refugee will be returned to [the country from which they came] without his consent."

Since the inception of the interdiction program, the INS has contemplated only a single interview of an alien interdicted at sea to determine whether to forward the applicant to the United States for further asylum processing.[14] In the February 29,

---

13. We recognize that the Protocol does not grant rights beyond those afforded under this nation's domestic law, *Bertrand v. Sava,* 684 F.2d 204, 219 (2d Cir.1982), however, the appellees argument is based upon domestic pronouncements, identified above, as well.

14. In 1982, the INS procedure provided, in relevant part, "[i]f the interview suggests that a legitimate claim to refugee status exists, the person involved shall be removed from the interdicted vessel, and his or her passage to the United States shall be arranged." In September 1985 the INS policy provided, "[i]f the I & NS Officer finds that the alien has a possible claim to asylum, he will forward the 'question sheet' by cable for advisory opinion from the Department of State, BHRHA. Once the opinion has been given, the I & NS Officer will make the determination to either forward the applicant to the United States, or return him to Haiti." A memorandum dated March 1, 1991 provided, "[a]liens expressing [a] credible fear of returning home should be routed to the United States to formally pursue an asylum claim before an Asylum Officer of the Miami Asylum Office. This standard for transfer to the United States[ ] is considerably less than the standard necessary to obtain asylum...." The above-referenced November 22, 1991 INS memoran-

1992 Rees memorandum, the policy of conducting a second interview of "screened in" Haitians detained on Guantánamo Bay was formally announced. According to this memorandum, asylum officers on Guantánamo Bay must find at this second interview that the interviewee has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion, and the second interviews are to "be identical in form and substance, or as nearly so as possible, to those conducted by asylum officers to determine whether asylum should be granted to an applicant already in the United States."

■ Until recent date, the government's policy has been to interdict boats sailing from Haiti and to transport those interdicted to Guantánamo Bay. Plainly, these appear to have been humanitarian acts consistent with the agreement and Protocol cited above. By these humanitarian actions alone, it does not appear that the legal status of the aliens was altered. However, once interdicted persons have been "screened in" the appellants' conduct would appear to have gone beyond a mere humanitarian function.[15] "Screening in" a Haitian alien implicates the Agreement Between the United States and Haiti, the Refugee Act of 1980, the Executive Order and the Protocol, to which we are a signatory. These affirmative actions by the Executive Branch and Congress can fairly be said to have established a reasonable expectation by the "screened in" plaintiffs in not being wrongly repatriated; we believe this expectation to be protected by the due process clause. *Cf. United States ex rel. Paktorovics v. Murff*, 260 F.2d 610, 614 (2d Cir. 1958) (Hungarian's acceptance of invitation to migrate to United States, pursuant to announced foreign policy of United States, offered by President in speech, effected a change in Hungarian's status to entitle him

to protection of the Constitution). Upon being "screened in," the Haitian aliens' fundamental legal and human rights status is changed vis-à-vis the United States government. Once "screened in"—that is, found by the governmental officials to have a credible fear of persecution if returned to Haiti—the plaintiffs are entitled to due process prior to United States officials altering their now-different status. *See Chun*, 708 F.2d at 877. In *Chun*, this court determined that "a refugee who has a 'well-founded fear of persecution' in his homeland has a protectable interest recognized by both treaty and statute, and his interest in not being returned may well enjoy some due process protection...." Although "screening in" a Haitian alien results in an apparent change in that alien's status, this change, of course, does not determine whether the alien is a "refugee" or is entitled to "enter" into the United States. However, we believe that the altered status of the Haitian alien does mean that the process thereafter employed by the United States with respect to determining the alien's "refugee" status should accord with some degree of due process protection.

The district court preliminarily found that the "screened in" plaintiffs were "de facto asylees" and that they could avail themselves of the due process clause of the fifth amendment to challenge the restrictions and the related conduct of the United States government officials. We agree, based upon the unique facts and circumstances of this case.

■ The change in the operation of the interdiction program by the Rees memorandum, which authorizes a "de facto" asylum proceeding at Guantánamo Bay "identical in form and substance" to one conducted in the United States, the continued detention of the Haitians on property that is subject to the exclusive control of the United

---

dum did not change that procedure, but attempted to clarify the definition of a "credible fear."

Although these INS memoranda are not regulations and are not entitled to the usual judicial deference, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), they are instructive as to how the INS implemented the Executive Order.

**15.** This is not to say that the interdicted Haitians have a right to the assistance of counsel during the initial "screening" interview.

States, and the INS' own finding that these Haitians possess "credible" fears of persecution if returned to Haiti, taken together, support the conclusion that there are serious questions going to the merits of the appellees' claim that the "screened in" plaintiffs may avail themselves of the due process clause of the fifth amendment. Permitting access to attorneys is a reasonable method to insure that the "screened in" plaintiffs are not wrongly repatriated to a country in which they have already been found by our government to have a credible fear of being persecuted.[16]

In the INA, Congress has determined that in asylum proceedings, an excludable alien should have the benefit of counsel. In our view, applying due process considerations, the Haitians once "screened in" enter a status akin to being asylees and also should have the advice of counsel.

### 3. Balance of the Hardships

■ The application of the "serious questions" portion of the preliminary injunction standard requires this Court to consider whether the district court abused its discretion in finding that the balance of the hardships tips decidedly in favor of the moving party. "Normally, the purpose of a preliminary injunction is to maintain the

status quo ante pending a full hearing on the merits. Occasionally, however, the grant of injunctive relief will change the positions of the parties as it existed prior to the grant." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985) (citations omitted). We conclude that insofar as the district court order *required* the appellants to permit the Haitian Service Organizations to have immediate access to the "screened in" Haitians prior to conducting second interviews or repatriating the Haitians to Haiti, "the controversy [would] have been settled with some finality." *Id.* To avoid that consequence, we vacate that portion of the district court's order.

■ Confronted with the district court's finding that repatriated Haitians "face political persecution and even death on their return" as compared with the appellants' contention that the "injunction interferes with the ability of the Executive officers to carry out their responsibilities, and therefore threatens to increase the numbers of Haitian migrants fleeing their country in unseaworthy boats," [17] we have relatively little difficulty in concluding that the district court did not err in finding that the balance of hardships tips decidedly in the appellees' favor. *See Mitchell,* 748 F.2d at

---

**16.** One commentator has noted with respect to the interdiction program with Haiti:

Interdiction represents a radical departure from normal inspection and inquiry procedures which afford an alien the opportunity to present his or her case, through counsel, to an immigration judge. As to refugees, interdiction runs afoul of the obligations under the domestic withholding provision and its international law correlative—Article 33 of the Protocol relating to the Status of Refugees—to refrain from refoulement. This is the duty not to expel or return a refugee to the frontiers of territories where his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.

A refugee who would otherwise undergo persecution might be returned upon interdiction without any recourse simply because of an inability to articulate the reasons feared, or to persuade an on-ship inspector that the fear is well-founded, or simply because he or she is afraid to speak to authorities. This is particularly so since there would be no access to counsel under these circumstances.

Arthur C. Helton, *Political Asylum under the 1980 Refugee Act: An Unfulfilled Promise,* 17 U.Mich.J.L.Ref. 243, 255 (1984) (footnotes omitted).

Despite these difficulties, herein the "screened in" plaintiffs have articulated reasons that governmental officials have deemed sufficient to establish that the Haitians have a "credible" fear of persecution if returned to Haiti. To now deny access to counsel when the "screened in" plaintiffs will be subjected to an interview "identical in form and substance ... as one conducted by an asylum officer in the United States" raises questions as to the lawfulness of the government's conduct.

**17.** Appellants assert as well that presentations by counsel are not necessary or helpful and that such presentations may engender delays in the process. Based upon the testimony of two INS officials assigned to Guantánamo Bay, the district court found that "the presence of attorneys during asylum interviews on Guantánamo would be useful, feasible, and would not interfere with the interview process." This finding is not clearly erroneous, thus this Court is not entitled to disturb this finding.

808. In balancing the hardships, we are aware that the government's assertion that Guantánamo Bay is an active military base is essentially uncontroverted. We recognize that the courts are not privy to the international, national and internal security concerns that are the proper concern of the Executive Branch and, also, that logistical problems will necessarily arise if attorneys are ordered onto the base. Of importance, the injunction, as modified below, preserves the *status quo* pending further proceedings in the district court, and at the same time the movants avoid being irreparably injured.[18] The injunction is affirmed, as modified, and the district court should immediately take steps to expedite the trial process.[19]

## CONCLUSION

In light of the above, to the extent consistent herewith, we affirm the district court's issuance of the preliminary injunction. However, we vacate so much of the preliminary injunction as requires the appellants to allow the "screened in" Haitian plaintiffs to have access to attorneys at Guantánamo Bay, but we uphold the order insofar as it enjoins the appellants from processing any further at Guantánamo Bay those Haitians who have already been "screened in" and we uphold the order enjoining the appellants from repatriating any such "screened in" Haitians without, in each instance, providing them access to attorneys through the Haitian Service Organizations or otherwise. The appellants are free, of course, to transport such persons to the United States or to any Congression-

ally designated port of entry where counsel may be available for the "screened in" Haitian applicants.

Affirmed, as modified.

MAHONEY, Circuit Judge, dissenting:

I respectfully dissent.

The majority holds that the interdiction by United States officials in international waters of individuals seeking illegally to enter the United States; the status of a leased United States naval base at Guantánamo Bay, Cuba; and the initial determination by INS officials that Haitians at Guantánamo Bay may possess credible asylum claims combine to endow such Haitians with Fifth Amendment due process protection, or at least to present serious questions in that regard.[1] I disagree, and accordingly would vacate the preliminary injunction ordered by the district court in its entirety.

The Supreme Court "has long held that an alien seeking initial admission into the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *see also Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores."). "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *United States ex rel.*

---

**18.** The public interest in having United States personnel comply with the Constitution is yet another reason to affirm the district court's order.

**19.** To the extent that the likelihood of success on the merits prong applies, we are inclined to agree with the district court's April 8, 1992 finding that the plaintiffs in the New York Action have met this standard as well. As discussed more fully above, the "screened in" plaintiffs have demonstrated that they will likely succeed on the merits of their fifth amendment claims because they were interdicted by the New York Action defendants in international waters, were found to have a credible fear of political perse-

cution if returned to Haiti and are being detained on land under the exclusive control of the United States.

**1.** Because of the majority's determination as to serious questions going to plaintiffs' Fifth Amendment claim, its opinion does not address the First Amendment claim of the Haitian Service Organizations. If I had occasion to address that issue, I would conclude that there is no right to relief on that claim, in accordance with *Haitian Refugee Center, Inc. v. Baker,* 953 F.2d 1498, 1511–15 (11th Cir.) (per curiam), *cert. denied,* ___ U.S. ___, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992).

*Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950).

Furthermore, the determination of procedures concerning the admissibility of aliens is not a power of Congress alone, but is also inherent in the authority of the executive branch to conduct foreign affairs. *Shaughnessy,* 338 U.S. at 543, 70 S.Ct. at 312. Congress has vested the Attorney General with almost complete discretion, within numerical limits, to permit immigration of refugees from outside the country's borders. *See* 8 U.S.C. § 157(c) (1988 & Supp. II 1990). Thus, there is generally no right to judicial review for aliens seeking entry to this country. *See Li Hing of Hong Kong, Inc. v. Levin,* 800 F.2d 970, 971 (9th Cir.1986) (Congress has power to exclude aliens from entry or prescribe conditions for entry and have executive branch enforce policy without judicial interference); *Petition of Cahill,* 447 F.2d 1343, 1344 (2d Cir.1971) (per curiam) (" 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.' ") (quoting *Shaughnessy,* 338 U.S. at 543, 70 S.Ct. at 312).

Although the majority opinion acknowledges these principles and concedes that the INA does not apply to Haitians at Guantánamo Bay, the majority nonetheless concludes that there are serious questions as to whether the plaintiffs are entitled to the protections of the Fifth Amendment's Due Process Clause. First, the majority opines that the unique nature of Guantánamo Bay—that it is subject to the exclusive control of the United States and that United States criminal laws are applied there—supports the conclusion that these protections might be available to the detained aliens.

The Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the *sovereign territory* of the United States." *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 1063, 108 L.Ed.2d 222 (1990) (emphasis added) (citing *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed.

1255 (1950)). The naval base at Guantánamo Bay is not sovereign territory of the United States. The lease agreement between the United States and Cuba for the naval base expressly states that "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the [naval base]." Agreement for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 23, 1903, U.S.—Cuba, art. III, T.S. No. 418. Accordingly, even though the United States exercises control over the naval base, the base is not sovereign territory of the United States where the plaintiff aliens are entitled to constitutional protections. Rather, they are accorded such protections only "when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo–Urquidez,* 110 S.Ct. at 1064.

Second, the majority suggests that the application of our criminal laws to the military base means that "by implication, the due process clause of the fifth amendment applies" to the Haitians there. Preliminarily, the fact that United States *citizens* are subject to United States laws does not add any support to the Haitians' claims. *Cf. id.* at 1063 (distinguishing between application of United States laws to citizens and noncitizens abroad). Further, it seems clear that due process protections are available to aliens outside this nation's sovereign territory only in a more limited way that does not impact upon the issues presented for disposition in this case.

Specifically, any party subjected to criminal prosecution under United States laws may well be entitled to constitutional protections *at trial. Cf. id.* at 1060 (Fifth Amendment privilege against self-incrimination "is a fundamental trial right of criminal defendants") (citing *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Janvier v. United States,* 793 F.2d 449, 455 (2d Cir.1986) (sentencing recommendation formerly authorized by 8 U.S.C. § 1251(b) is part of criminal, not deportation, proceeding, so Sixth Amendment right to counsel applies). Thus, if an alien located at Guantánamo Bay were to be prosecuted under United States law, he might

well be entitled to some constitutional protections at trial. Any such entitlement, however, is clearly a separate question from the issues presented here. *Cf. Verdugo–Urquidez,* 110 S.Ct. at 1060 (distinguishing between trial and nontrial constitutional protections in context of extraterritorial application); *id.* at 1067–68 (Kennedy, J., concurring) (same).

Similarly, I find unpersuasive the majority's view that because "the due process clause applies to both the statutory asylum procedure employed by the INS, *see Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir. 1984), and the treatment of excludable aliens detained within the United States," invoking *Lynch v. Cannatella,* 810 F.2d 1363, 1374 (5th Cir.1987), and *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1387 (10th Cir.1981), there is a serious question whether the alien plaintiffs have a due process right to consult with counsel at Guantánamo Bay. *Augustin v. Sava* involved an asylum proceeding conducted within the United States. *Lynch v. Cannatella* held that "excludable aliens ... are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials." 810 F.2d at 1374; *see also Correa v. Thornburgh,* 901 F.2d 1166, 1171 n. 5 (2d Cir.1990) ("Other than the protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection."). *Rodriguez–Fernandez v. Wilkinson* ruled that "an excluded alien in physical custody within the United States may not be 'punished' [in that case, imprisoned indefinitely] without being accorded the substantive and procedural due process guarantees of the Fifth Amendment." 654 F.2d at 1387. I see little assistance in any of these cases for the resolution of the due process issues presented on this appeal.[2]

Finally, it is the majority's view that once Haitians at Guantánamo Bay have been "screened in," i.e., found to possess a credible fear of returning to Haiti, they should be deemed "de facto asylees" who "have established a reasonable expectation ... in not being wrongly repatriated ... [that is] protected by the due process clause." It is clear, however, that the "screening in" of a Haitian alien does not determine whether the alien is a "refugee" or is entitled to admission to the United States, and that the determination of refugee or asylee status rests solely with the appropriate INS officials, and not with this court.

In this case, the initial screening interview is simply one step in the process for an alien interdicted at sea to gain admission into this country. Congress has explicitly authorized the executive to exclude an alien seeking admission who is determined to have a communicable disease. 8 U.S.C. § 1182(a)(1)(A)(i) (Supp. II 1990). It accordingly seems curious that a second screening interview of an individual located outside this country, designed to gather information that might aid the Attorney General in reaching a determination whether to exercise his discretion and waive the exclusion, *see* 8 U.S.C. § 1157(a)(3) (1988), would run afoul of the Constitution. Nor is a serious constitutional question presented, as I see it, because the INS initially conducted a single-interview process with respect to the "screening in" of the Haitians at Guantánamo Bay, but subsequently determined to conduct a second interview of those determined to have a communicable disease.

For all the foregoing reasons, plaintiffs-appellees have not established, in my view, either a likelihood of success on the merits or the existence of serious questions going to the merits with respect to their Fifth Amendment due process claims. I would accordingly vacate the preliminary injunction in its entirety.

---

**2.** I note in this connection the district court's finding that "[n]o detainee in custody is free to go to any country other than Haiti even at their [sic] own expense." The government has represented that the detainees are free to go to any country that will accept them, but that acceptances have not been forthcoming. I am unaware of any reason to disbelieve that representation.