Curran, Dennis J., J.
The plaintiffs seek judicial review under G.L.c. 30A and G.L.c. 249, of the Massachusetts Division of Banks’ finding that the plaintiffs’ actions violated G.L.c. 140, §§96 and 110, G.L.c. 271, §49 and G.L.c. 93, §§24 through 24G. The plaintiffs now move for judgment on the pleadings, arguing that the Massachusetts Division of Banks lacked jurisdiction and failed to hold a hearing. For the following reasons, the plaintiffs’ motion is ALLOWED in part and DENIED in part.
BACKGROUND
Western Sky is a loan originator that is wholly owned by a member of the Cheyenne River SiouxTribe, licensed by the tribe and located on its reservation in South Dakota. Western Sky advertises small loans to Massachusetts residents, directing those interested in applying for a loan to do so through Western Sky’s internet address. A number of Massachusetts residents applied for and obtained loans through the internet or telephone. The loan agreements all contained similar terms, including:
This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River SiouxTribe, Cheyenne River Indian Reservation. By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.
The agreements further stated:
This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe . . . Neither this Agreement nor [Western Sky] is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Sioux Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River SiouxTribe, and that no United States or federal law applies to this Agreement.
They also contained an arbitration clause requiring disputes “to be resolved by [a]rbitration, which shall be conducted by the Cheyenne River Sioux Tribal National by an authorized representative in accordance with its consumer dispute rules.”
The Agreements went on to note the interest rate— often 139% per annwm—and authorized Western Sky to debit electronic funds transfers from the borrower’s checking account to make scheduled payments. After accepting the loan applications, Western Sky sold the loans to CashCall Inc.’s wholly-owned subsidiary, WS Funding, LLC. CashCall then serviced the loans for WS Funding. Both CashCall and WS Funding are California corporations.
Between 2011 and 2013, the Division of Banks received complaints from individuals about the extremely high interest rates and fees to which they were being subjected on these loans. The Division contacted the plaintiffs and advised them that their actions may violate Massachusetts law, and requested that they sign affidavits declaring that they would stop making and collecting on these loans with Massachusetts residents. The plaintiffs retorted that Western Sky is not subject to Massachusetts state regulation, that it operates solely and exclusively under Federal Indian law and the laws of the Cheyenne River Sioux, that CashCall does not issue loans, and that both CashCall and WS Funding stand in the shoes of Western Sky and are not subject to state regulation. The plaintiffs refused to sign the proposed affidavits.
Thereafter, the Division, without a hearing, sent a cease and desist letter to each plaintiff stating that each had engaged in the small loan business without a license in violation of G.L.c. 140, §§96, 110, that CashCall acted as a debt servicer without registering as a third-party servicer in violation of G.L.c. 93, §§24-24G, and that each plaintiff violated the state criminal usury statute, G.L.c. 271, §49. The cease and desist orders specifically directed the plaintiffs to cease collecting on loans made to Massachusetts borrowers, refrain from transferring the loans, refund all interest charges and fees received from borrowers during the last four years, and submit a list of borrowers to whom reimbursement is owed.
*7 DISCUSSION
Under G.L.c. 30A, the Court may only set aside an agency decision if it is legally erroneous, procedurally defective, unsupported by substantial evidence or is arbitrary and capricious. G.L.c. 30A, §14; Brackett v. Civil Service Comm’n, 447 Mass. 233, 241-42 (2006). The plaintiffs argue that the Division’s decision was legally and procedurally defective.[1]
I. Jurisdiction
The plaintiffs first contend that the Division cannot regulate or otherwise exercise jurisdiction over them, because the doctrine of Indian Sovereign Immunity provides: “[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that [s]tate laws shall apply." McClanahan v. Arizona State Tax Comm’n, 411 U.S. 164, 170-71 (1973). They further contend that the borrowers consented to the exclusive jurisdiction of tribal arbitration, courts and law.
A. State Regulation
“The breadth of a state’s regulatoiy power depends upon two criteria—the location of the targeted conduct and the citizenship of the participants in that activity. Native Americans ‘going beyond the reservation boundaries’ must comply with state laws as long as those laws are ‘non-discriminatory [and]... otherwise applicable to all citizens of [that] State.’ ” Otoe-Missouria Tribe of Indians v. N. Y. State Dep’t of Fin. Servs., 769 F.3d 105, 113 (2d Cir. 2014), quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49 (1973). In Otoe-Missouria Tribe of Indians, the state of New York sought to bar the plaintiffs from extending loans with triple digit interest rates to New York residents. Id. at 114. The loans in question, like those in the present case, were made primarily over the internet and purported to be governed by the tribe’s law to the exclusion of state law. Id. at 108. The Second Circuit held that the plaintiffs failed to prove that the state was regulating “on-reservation” conduct because the loans were all applied for from New York, and the transaction included the collection as well as the extension of credit in New York, and the tribe was permitted to burrow into borrowers’ bank accounts which were located in New York. Id. at 114-15.
All of these same considerations are present here. All of the loans were applied for, paid from, and collected from Massachusetts. Western Sky reached well beyond the reservation’s boundaries to transact business with Massachusetts residents. The Massachusetts statutes at issue are non-discriminatoiy and apply to all citizens of the state and those who conduct their business here. Massachusetts may therefore regulate the loans made by Western Sky.
B. Consent to Jurisdiction
Alternatively, the plaintiffs argue that even if Massachusetts may regulate this conduct in general, the borrowers consented to the exclusive jurisdiction of the tribe’s law. This case is essentially identical to Jackson v. Payday Financial, LLC, 764 F.3d 765 (7th Cir. 2014), in which these plaintiffs were sued by borrowers from Illinois who signed loan agreements identical to those in the present case, and whose claims are for the same types of violations found by the Division. The defendants in Jackson argued that the plaintiffs agreed to the exclusive jurisdiction of the tribal courts and arbitration and could not sue in federal court, and the argument was soundly rejected by the Seventh Circuit based on Supreme Court precedent limiting immunity and tribal authority to acts taking place on the reservation. See id. at 782 (“ ‘We have frequently noted, however, that the sovereignty that the Indian tribes retain is of a unique and limited character. It centers on the land held by the tribe and on the tribal members within the reservation.’ In short, ‘Montana and its progeny permit tribal regulation of nonmember conduct inside the reservation that implicates the tribe’s sovereign interests’ ”) (emphasis in original), quoting Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327, 332 (2008).
The ability of a tribal court to adjudicate any claim involving a nonmember pertains to its subject matter jurisdiction, and a party has no lawful authority to grant subject matter jurisdiction to a tribal court. Id. at 783, citing Plains Commerce Bank, 554 U.S. at 337 (even if nonmember consents to jurisdiction any tribal regulation must derive from its “inherent sovereign authority to set conditions on entiy, preserve tribal self-government, or control internal relations”), and Nevada v. Hicks, 533 U.S. 353, 367 (2001) (“where nonmembers are concerned, the exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation”) . All of the considerations in Jackson are present here. The relevant General Laws consider the acts done in Massachusetts because the individuals completed and submitted their applications in Massachusetts and the money was advanced to Massachusetts. G.L.c. 140, §96. These loans are not related to “on-reservation activity” and are not necessary to protect tribal self-government or internal relations. Hicks, 533 U.S. at 367. The tribal courts utterly lack jurisdiction, which cannotbe granted through a contract, and thus, the choice of forum clauses are a nullity.
II. Right to a Hearing
The plaintiffs next argue that if the Division could exercise authority over them, it was required to hold a hearing before issuing the cease and desist orders. The Division is empowered to receive complaints and issue orders by G.L.c. 140, which states, in relevant part, “[i]f a greater rate of interest or amount for expenses than is allowed under sections ninety-six to one hundred and eleven, inclusive, has been paid on any loan to which said sections apply, the person who *8 paid it may file a complaint with the commissioner; who may, after a hearing, order such excess amounts refunded, or may make such other order as he may deem necessaiy.” Id. §106 (emphasis added). Similarly, G.L.c. 93 states “No order under this section . . . may be entered without prior notice of and opportunity for a hearing." G.L.c. 93, §24J(c) (emphasis added).
The plaintiffs are correct that the statutes plainly required the Division to hold a hearing before issuing any order. A hearing in this context is a fundamental, statutorily-created procedural right. The Division, however, responds that it need not hold a hearing— and due process will not be violated—where the hearing “would be a meaningless exercise” because facts are undisputed.[2] Kobrin v. Board of Registration in Med., 444 Mass. 837, 846 (2005), citing Codd v. Velger, 429 U.S. 624, 627-29 (1977) (due process does not require hearing where there is no factual dispute between parties). Certain relevant facts are not disputed: that Western Sky was on the reservation and the borrowers were in Massachusetts; the loans were made over the phone or the internet; what the interest rate was; the loans were sold to WS Funding and serviced by CashCall; and the terms of the loan agreements.[3] Although these facts were undisputed, it is disturbing that two statutes enacted by the legislature—as the people’s’ representatives—were completely ignored by an absolutist and overbearing executive department. The plaintiffs were entitled to a hearing, and they shall have one.[4]
ORDER
For these reasons, the plaintiffs’ motion for judgment on the pleadings is ALLOWED in part and DENIED in part.
This matter is remanded for a hearing before the Massachusetts Division of Banks, as required by G.L.c. 140, section 106 and G.L.c. 93, section 24J(c). The Court respectfully suggests that such a hearing be held as expeditiously as possible.

 There is some disagreement over whether this Court is vested with jurisdiction under G.L.c. 30A, §14 or G.L.c. 249, §4. The distinction is largely academic because neither party disputes the Court’s ability to decide this case and the standards of review are essentially the same. It is worth noting though that the Court proceeds under G.L.c. 30A, §14fortwo reasons: (1) the Division’s order regarding CashCall failing to register as a debt collector is explicitly governed by G.L.c. 30A, see G.L.c. 93, §24J(d), and (2) the order for violation of G.L.c. 140 was the result of an “adjudicatory proceeding” within the meaning of G.L.c. 30A, as it was “a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required ... by any provision of the General Laws to be determined after opportunity for an agency hearing,” G.L.c. 30A, §1(1), see G.L.c. 4, §7 (definition of “person” in a statute shall include corporations), and, as discussed below, G.L.c. 140, §106 requires a hearing.

 The Division curiously notes that G.L.c. 140, §106 attaches no consequence to a failure to hold a hearing, impliedly arguing that even if due process required the Division to hold a hearing, it cannot be faulted for not doing so. This argument reflects a fundamental misunderstanding of statutory construction. Section 106 explicitly requires a hearing in order to empower the commissioner to take action, therefore, if there is no hearing there is no authority to issue any order— except in the narrow circumstances discussed. The Division’s reading of the statute improperly omits crucial words, see Ropes & Gray LLP v. Jalbert, 454 Mass. 407, 412 (2009) (“A statute should be construed so as to give effect to each word, and no word shall be regarded as surplusage”), and ignores the existence of other statutes that permit judicial review of due process violations, despite citing one such statute in its memorandum. See G.L.c. 30A, §14, G.L.c. 249, §4.

 The plaintiffs argue that the extent of CashCall’s control over WS Funding needed to be explored to determine whether they are in fact the same entity. The doctrines of piercing the corporate veil and alter ego are theories under which liability may be imposed where “the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud.” Scott v. NG US 1, Inc., 450 Mass 760, 766 (2008), quoting United States v Bestfoods, 524 U.S. 51, 62 (1998), and do not apply defensively.

 Given that this decision has already determined the issues of jurisdiction, state regulation and—lest there be any doubt—the inapplicability of tribal court law—the hearing shall be strictly limited to any additional relevant facts which the parties have not previously agreed to or wish to proffer.